# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Fort Lauderdale Division

JESSICA NORTON,

        Plaintiff,

    v.

BROWARD COUNTY SCHOOL BOARD;
COMMISIONER MANNY DIAZ, JR., in his
official capacity as the Commissioner of the
Florida Department of Education; HOWARD
HEPBURN, Superintendent of Schools Of
Broward County Public Schools, In His
Individual Capacity; DAVID AZZARITO,
Chief People Officer Of Broward County
Public Schools, In His Individual Capacity;
CRAIG KOWALSKI, Former Chief Of The
Special Investigative Unit Of Broward
County Public Schools, In His Individual
Capacity; HOLLY TELLO, Detective Of The
Special Investigative Unit Of Broward
County Public Schools, In Her Individual
Capacity; THOMAS HONAN, Detective Of
The Special Investigative Unit Of Broward
County Public Schools, In His Individual
Capacity; BRENDA FAM, Member Of
Broward County School Board, In Her
Individual Capacity

        Defendants.

Civil Action No. 24-61874

Hon. Roy K. Altman

Amended Complaint for Injunctive,
Compensatory, and Exemplary Relief

## AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

### INTRODUCTON

1.     In the United States, government officials cannot use their power to retaliate against a

woman for filing a lawsuit on behalf of her daughter or for standing up in defense of her child.

When Jessica Norton—a Broward County Public Schools employee—filed a federal civil rights lawsuit in this Court to protect her daughter by challenging the legality of a Florida statute that would profoundly impact her child, Defendants did not just defend their law – they singled Jessica Norton out and orchestrated a campaign of retaliation against her hidden behind a pretext of school policy.  The message was clear:  speak up for your child, challenge our authority, and there will be consequences.  Defendants' retaliatory conduct violated Ms. Norton's legal rights and warrants injunctive, compensatory, and exemplary relief.

2.     Jessica Norton's daughter, D.N., played sports with other girls in elementary school. She played sports with other girls in middle school.  She wanted to continue playing sports with other girls in middle school and had the full support of her parents and the school at which she was enrolled.  D.N. also wanted to continue playing sports with other girls in high school. When Florida enacted a law that would bar D.N. from playing girls' sports, her parents believed that law violated the rights of their daughter and other transgender children.  Ms. Norton and her family acted by availing themselves of their rights under the law—they filed a lawsuit on a matter that was important not just to their family, but to all Floridians.

3.     This case is not about the Underlying Litigation.  It is about what happened next.  The Broward County School Board (the "School Board"), Manny Diaz, Jr., Commissioner of the Florida Department of Education (the "DOE"), and all Defendants in this case, retaliated against Ms. Norton for filing a lawsuit challenging Defendants' exclusion of her transgender daughter from school sports as sex discrimination in violation of Title IX (the "Underlying Lawsuit").

4.     As an initial matter, the School Board and Defendants Hepburn and Kowalski initiated an investigation in response to Ms. Norton's lawsuit against the school.

5.      On information and belief, the scope of the School Board's investigation was determined by Defendant Kowalski, and its process carried out by Defendants Honan and Tello.

6.      As an immediate result of that investigation, Ms. Norton was removed from her clerical role at Monarch High School and temporarily reassigned to warehousing services and, later, to the custodial grounds department during the course of the investigation.

7.      Ultimately, acting on a recommendation from Defendants Azzarito and Hepburn, the School Board suspended Ms. Norton for 10 days without pay, removed her from her job at Monarch High School, and permanently reassigned her to a position at a non-school site with a longer commute and fewer opportunities for supplemental pay.

8.      During this time period, the DOE joined the School Board's investigation, and, relying on the allegations and findings of the School Board, Defendant Diaz also retaliated against Ms. Norton by recommending sanctions against Ms. Norton's coaching certificate.

9.      In short, Defendants have worked together to effectively exclude Ms. Norton from her school community, where she was a valued employee, an active parent, and an engaged community member, and damage her professional reputation.

10.     Defendants' retaliatory actions were unlawful, violating the legal protections afforded by Title IX of the Education Amendments of 1972 and the First Amendment of the Constitution of the United States.

## PARTIES

11.     Plaintiff Jessica Norton is a resident of Broward County, Florida.  She is a mother to three children—including a transgender daughter—and since March 2017, an employee of Broward County Public Schools.

12.     Defendant Broward County School Board oversees 327 public schools in Broward County and 31,000 school employees, determines programs for the operation and administration of the District school system, and makes decisions concerning employment and discipline of public-school employees.  The School Board of Broward County is the body which determines all questions of general policy to be employed for the administration of the District schools.  Members of the School Board are either elected by Broward County voters or appointed by the Governor of Florida, currently Governor Ron DeSantis.  During the 2023–2024 school year, the Broward County School District received the plurality of its funding from local sources but also received funding from federal sources.[1]

13.     Defendant Manny Diaz, Jr., is Commissioner of the Florida State Department of Education (the "DOE").  He is named as a Defendant in his official capacity.  As Commissioner of the DOE, Defendant Diaz sets statewide educational policy in Florida.  He has authority to investigate and prosecute complaints against educator certificate holders under Florida Statute Section 1012.796.  Pursuant to that authority, Manny Diaz may decline to prosecute.

14.     Defendant Howard Hepburn is Superintendent of Schools of Broward County Public Schools.  He is named as a Defendant in his individual capacity.  As Superintendent, Defendant Hepburn is responsible for "[r]ecommend[ing] all personnel employed by the School Board," and "shall be the Secretary and Executive Officer of the School Board."[2]

15.     Defendant David Azzarito is the Chief People Officer of Broward County Public Schools and is being sued in his individual capacity.  As Chief People Officer, Defendant Azzarito's responsibilities include "supervis[ing] staff as assigned in the performance of job

---

[1] BCPS Budget Book 2024, available at https://www.browardschools.com/Page/35674.
[2] https://www.browardschools.com/cms/lib/FL01803656/Centricity/Domain/14019/A-001%20Supt%20of%20Schools_1Job%20Description.pdf.

duties," and "[e]nforc[ing] the negotiated contracts and oversee[ing] the grievance, arbitration, and mediation process."[3]

16.     Brenda Fam is a member of the Broward County School Board and is being sued in her individual capacity.

17.     Craig Kowalski was, at all relevant times, Chief of the Special Investigative Unit of the Broward County Public Schools and is being sued in his individual capacity.  As Chief of the Special Investigative Unit, Defendant Kowalski reported directly to the Superintendent of Schools and was responsible for supervising special investigations, including the investigation into Ms. Norton.[4]

18.     Holly Tello is a Detective with the Special Investigative Unit of the Broward County Public Schools and is being sued in her individual capacity.

19.     Thomas Honan is a Detective with the Special Investigative Unit of the Broward County Public Schools and is being sued in his individual capacity.

## JURISDICTION AND VENUE

20.     This action arises under the First Amendment of the United States Constitution, 42 U.S.C. § 1983, and Title IX of the Education Amendments of 1972.

21.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States, and because Plaintiff brings this action to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

---

[3] https://www.browardschools.com/domain/25581.
[4] https://www.cgcs.org/cms/lib/DC00001581/Centricity/Domain/43/CGCS-Ad-Chief%20Special%20Investigative%20Unit.pdf

22.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because the Broward County School Board is a municipal government entity, Defendant Diaz, as Commissioner of the Florida DOE, represents a state government entity, some of the individual Defendants reside in this jurisdiction, and all reside in the State of Florida; and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

23.     It is within the power of this Court to provide injunctive relief, and monetary damages pursuant to Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201 and 2202.

## FACTUAL ALLEGATIONS

## I.     Plaintiff's Background as a Parent in the Broward County Public School System

24.     Jessica Norton is a longtime resident of Coconut Creek, Florida, a close-knit community in Broward County.  She has three children, all of whom attended Broward County Public Schools, beginning in elementary school.

25.     Ms. Norton's youngest daughter, D.N., is a transgender girl.  D.N. has presented and been acknowledged as female in school since the first grade.  Her teachers and peers have referred to her using feminine pronouns.  She has also played sports with other girls since elementary school.  Sports have been an important part of her educational and social-emotional development.

26.     In 2016, when Ms. Norton's daughter was in second grade, Ms. Norton, in her capacity as D.N.'s parent and as PTA President at D.N.'s elementary school, attended an informational LGBTQ roundtable session with then Superintendent of Broward County Schools Robert Runcie.

27.     At the time, roundtable meetings were hosted several times a year and attended by parents, community leaders, stakeholders, Superintendent Runcie and District and school level staff.

28.     During one roundtable meeting, the group discussed, among other things, what and how student demographic information could be changed in the school's online system to better accommodate transgender children like Ms. Norton's own daughter.

29.     During the roundtable, Mr. Runcie confirmed that a transgender student's sex designation could be changed in the District's uniform student information system, TERMS, to accurately reflect the student's gender identity.

30.     In or about the Spring of 2016, relying on Mr. Runcie's guidance during the roundtable, Ms. Norton went to the front office at her daughter's elementary school and asked that her daughter's gender marker be changed in TERMS to accurately reflect her female gender identity.

31.     Ms. Norton then spoke with Assistant Principal Traci Porter, who changed D.N.'s sex designation to female.[5]

32.     This conversation led to a series of discussions with the then District General Counsel concerning how to ensure that gender marker change guidelines would be applied consistently and in accordance with the District's non-discrimination policy.  The District further codified Mr. Runcie's guidance in or around 2018 by issuing a memo confirming to District personnel the process by which a student's gender marker could be changed in TERMS.

---

[5] In the Investigative Report summarizing the SIU's later investigation, detailed further below, Defendant Tello reported that Ms. Norton made this request to Winston Park Elementary School's Information Management Technician, Mary Williams, in 2017 and that Ms. Williams reported that she "wasn't comfortable with changing it but I did it . . . mom was very demanding and she may have pushed me to do it without documents."  Ms. Williams later retracted these statements and was investigated for her dishonesty.

33.     In 2020, the Broward County Public Schools LGBTQ Critical Support Guide, a guide for Broward County administrators, was also updated to reflect this policy and stated that "[p]arents of students under the age of 18 may request a gender marker change.  Parents, or students 18 years and older, will need to write, sign, and date a brief letter requesting their gender marker be changed on all education records. After the request letter is submitted to an administrator or school registrar, the student's gender marker will be changed from 'F' for 'female' to 'M' for male, or vice versa in TERMS," the school system's demographics database.[6]

34.     Subsequently, on July 2, 2021, the State of Florida amended the gender marker on Ms. Norton's daughter's Florida birth certificate.  The family obtained a court-ordered legal name change in 2023.  Ms. Norton provided copies of the legal documents reflecting those changes to the Broward County Public School District.

**II.     Plaintiff's Employment with Broward County**

35.     In March 2017, Ms. Norton was hired as a Library Media Clerk at Monarch High School, a public high school in Coconut Creek that is part of the Broward County Public School System.  Beginning on July 1, 2021, Ms. Norton was certified as an athletic coach for a period of 3 years by the Defendant Florida Department of Education, which allowed her to assist with coaching first the boys' Varsity Volleyball team, and later the girls' Junior Varsity Volleyball team at Monarch High School.

36.     Ms. Norton did not assist with coaching her daughter's volleyball team.

37.     In March 2022, Ms. Norton was promoted to the position of Information Management Specialist at Monarch High School.

---

[6] https://readlion.com/wp-content/uploads/2022/06/Broward-County-Public-Schools-LGBTQ-Guide.pdf

38.     Since being hired, Ms. Norton has been a member of the Federation of Public Employees (FOPE) and is covered by the provisions of its Collective Bargaining Agreement.

39.     Ms. Norton was a valued employee at Monarch High School.

40.     Ms. Norton consistently received excellent ratings in her personnel evaluations.

41.     Ms. Norton received overall performance ratings of "excels" for all personnel evaluations conducted between 2020 and 2023.  Comments in her evaluations included, "exceptional - works very hard", "excellent - never called out sick", "exceptional", "model associate", and "better than any employee he has ever had."

42.     Prior to November 2023, Ms. Norton has no employee disciplinary record.

43.     Ms. Norton was never employed by her children's elementary or middle schools and did not have access to student records for those schools.

**III.    In 2021, Ms. Norton's Family Challenged SB 1028**

44.     On June 1, 2021, SB 1028, a state law which prohibits transgender girls from participating in school sports on teams that align with their gender identity, was signed into law.[7]  SB 1028 prohibits transgender girls from participating in girls' sports simply because they are transgender girls.  The law became effective on July 1, 2021.

45.     In the wake of the enactment of SB 1028, Ms. Norton and her family quickly understood that the law would have profound and negative effects on her family, as well as other transgender children and their families throughout Florida.

46.     Ms. Norton and her family elected to exercise their constitutional right to "petition the government for a redress of grievances."  U.S. Const. Amend. I.  Specifically, on June 29, 2021, Jessica Norton and her husband, Gary Norton, filed a federal lawsuit, on behalf of their

---

[7] SB 1028 is colloquially referred to as the Fairness in Women's Sports Act.

daughter.  The lawsuit challenged the legality of SB 1028 on the grounds that the law violated their daughter's rights under the Constitution and Title IX.  It was captioned *D.N. v. DeSantis*, No. 21-CV-61344, (S.D. Fla.) (*hereinafter* "the Underlying Lawsuit").

47.     To protect their child's safety and privacy, the Underlying Lawsuit identified Ms. Norton and her husband as Jessica N. and Gary N., and referred to Ms. Norton's daughter, D.N., only by her initials.  Under the terms of a Stipulated Protective Order, all parties to the Underlying Lawsuit agreed that any information "linked or linkable" to Ms. Norton or her family members was to be designated as "Confidential Attorneys' Eyes Only Information" and used "solely for the prosecution or defense (or in the case of the Court and court personnel, adjudication) of [the Underlying Lawsuit]."  ECF No. 65-1.

## IV.     Defendants Retaliate Against Ms. Norton for Exercising Her Rights

48.     On information and belief, Defendants began to target Ms. Norton and her family for retaliation almost immediately after she filed the Underlying Lawsuit.

49.     First, on July 19, 2021, just three weeks after Ms. Norton filed the Underlying Lawsuit and five days after an attorney noticed an appearance on behalf of the Defendant Broward County School Board, Marylin Batista (then Interim General Counsel of the School Board) requested D.N.'s cumulative school record.

50.     Ms. Norton and her family had filed suit in anonymity and counsel for the School Board in the Underlying Lawsuit represented to plaintiffs' counsel that the School Board and District staff did not know the identity of Ms. Norton or her family.

51.     Notwithstanding counsel's representations, the School Board had at least constructive knowledge of the identity of Ms. Norton and her family in or around July 2021, and using that knowledge, requested D.N.'s cumulative file for unknown reasons.

52.     Ms. Norton only discovered this fact more than 2 years later after receiving the SIU Investigative Report and has never been given an explanation for why her child's file was pulled at that time.

53.     On information and belief, having pulled D.N.'s file, the School Board continued to monitor Ms. Norton and the Underlying Lawsuit.

54.     On January 31, 2022, the district court *sua sponte* stayed the Underlying Lawsuit pending a decision from the Eleventh Circuit Court of Appeals in *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022), a case addressing whether a school district in Florida could prohibit transgender students from using bathrooms that correspond with their gender identity.  The district court stated that the Eleventh Circuit's *en banc* decision in *Adams* "may materially affect the result" in the Underlying Lawsuit.

55.     That fall, while the case was stayed, D.N. began attending Monarch High School.  She joined the girls' volleyball team and participated in the 2022 and 2023 girls' volleyball seasons.

56.     On January 6, 2023, the stay on Ms. Norton's Underlying Lawsuit was lifted, and the litigation resumed.

57.     On November 6, 2023, the Court dismissed Ms. Norton's complaint with leave to amend by November 21, 2023.  *D.N. by Jessica N. v. DeSantis*, No. 21-CV-61344, 2023 WL 7323078, at *19 (S.D. Fla. Nov. 6, 2023).

58.     On November 16, 2023, Ms. Norton moved for an extension of time to amend the underlying complaint.  The motion was granted the same day.[8]

59.     In response, Defendants initiated a course of conduct to retaliate against Ms. Norton.

---

[8] An Amended Complaint was filed in the Underlying Lawsuit on January 11, 2024.

60.     Defendants' conduct violated clearly established constitutional law and other rights of which Defendants knew and/or of which a reasonable school district employee should have known.

**V.     Defendants Initiated an Improper Investigation that Departed from the District's Ordinary Procedures for Investigating Employee Misconduct**

61.     According to the subsequent Investigative Report, the SIU Investigation was initiated on November 21, 2023, when School Board member Daniel Foganholi reported an allegedly "anonymous" tip to the Broward County Special Investigative Unit that "a male student [] was playing female sports at Monarch High School."

62.     This was just five days after Ms. Norton signaled her intention to file an Amended Complaint, by moving on November 16, 2023 for an extension of time to amend the underlying complaint, which was granted.

63.     According to the Investigative Report, sometime between November 21, 2023 and November 27, 2023, North Regional Superintendent Dr. Jermaine Fleming called a meeting of a group of high-level officials from the Broward County School District.  The Investigative Report implied that this meeting was related to the tip that Mr. Foganholi received.

64.     Participants in the meeting included Defendant Craig Kowalski of the Broward County Public Schools' Special Investigative Unit (sometimes referred to as the Broward Schools' Police Department), Chief Jaime Alberti of the Broward County Schools' Division of Safety, Security and Emergency Preparedness, and Broward County Public Schools' Chief Information Officer Dr. Josiah ("Joe") J. Phillips.

65.     On November 27, 2023, Ms. Norton was called to attend an all-hands meeting at Monarch High School, where Todd LaPace, Director at the North Regional Office of Broward County Public Schools, announced to the Monarch High School staff that Monarch High

School's principal, James Cecil, had been administratively reassigned pending an investigation.

66.     On information and belief, Mr. Cecil was not disciplined beyond this temporary reassignment.

67.     While other District employees, including Mr. Cecil, were also initially investigated, those employees were not subject to the invasive and expansive investigation that was conducted against Ms. Norton.  Moreover, those employees were either never reassigned or cleared to return to work in May 2024.

68.     Following this meeting, Ms. Norton was called into the office of her supervisor, Amber Hendrick, the Monarch High School Office Manager.

69.     In Ms. Hendrick's office, Ms. Norton met an armed officer: Defendant Craig Kowalski.

70.     Defendant Kowalski's presence was notable for at least two reasons.

71.     *First*, Defendant Kowalski was the Chief of the Broward County Public Schools' Special Investigative Unit; the head of a police force overseeing over 32,000 employees.

72.     On information and belief, as Chief of the Special Investigative Unit, Defendant Kowalski did not routinely (if ever) serve as an investigating officer, interview witnesses, or serve notice of investigations on school employees.

73.     *Second*, under Broward County School Board Policy 4.9, which provides detailed guidelines for conducting employee misconduct investigations, the Special Investigative Unit ("SIU") will conduct workplace investigations only "regarding allegations that have the potential to be criminal in nature, ***or of such a serious offense that the SIU deems it warranted***."  (Emphasis added.)  All other employee investigations not conducted by the SIU

are conducted by the employee's supervisor under the guidance of the District's Employee and Labor Relations Department.  Broward County School Board Policy 4.9, Sec. 4.3(a).

74.     On information and belief, pursuant to Broward County School Board Policy 4.9, Defendant Kowalski, as Chief of the SIU, made the decision to have the SIU conduct the Investigation rather than the Employee and Labor Relations Department.

75.     On information and belief, the use of the SIU investigative process in this context was inconsistent with District policy and prior practice and was designed to intimidate Ms. Norton.

76.     Defendant Kowalski handed Ms. Norton a written notice and a letter of reassignment, both of which he signed, and informed her that she was under investigation for employee misconduct based on an allegation of her "failure to adhere to Section 1006.205, Florida Statutes and Rule 6A-10.081, Florida Administrative Code."

77.     Section 1006.205 of the Florida Statutes is SB 1028, the law banning transgender girls from playing on girls' sports teams.  It creates a private cause of action for students.  It does not create a criminal or civil cause of action against school employees.

78.     Regardless, acting pursuant to Broward County School Board Policy 4.9, on information and belief, Defendant Kowalski made the decision to deem this Investigation of a "serious offense."

79.     Rule 6A-10.081, of the Florida Administrative Code refers to the full "Principles of Professional Conduct for the Education Profession in Florida," which lists 37 requirements for Florida educators, ranging from "cooperat[ing] with the Education Practices Commission in monitoring the probation of a subordinate" to "maintaining the respect and confidence of one's colleagues."

80.     The School Board did not inform Ms. Norton which of these 37 requirements she was accused of violating.

81.     The Notice did not specify what Ms. Norton had allegedly done to violate any law, rule, guidance, or policy, apparently disregarding Broward County School Board policy requiring detailed factual allegations be provided to employees charged with employee misconduct.  *See* Broward County School Board Policy 4.9.[9]

82.     Ms. Norton stated that she did not understand the Notice.

83.     Defendant Kowalski responded that Ms. Norton was under investigation for causing the school to not comply with SB 1028.

84.     Defendant Kowalski repeatedly referred to Ms. Norton's daughter as a boy despite school records and legal documents reflecting D.N. being a girl.

85.     Defendant Kowalski referred numerous times to the Underlying Lawsuit, indicating that the Investigation was related to the Underlying Lawsuit Ms. Norton filed on behalf of her daughter.

86.     At the conclusion of this meeting, Defendant Kowalski also informed Ms. Norton, a clerical worker at Monarch High School since 2017, that she was being reassigned to Warehousing Services, "pending the outcome of a personnel investigation."  She was directed not to return to Monarch High School, where her daughter was enrolled as a student, "unless so directed by [Chief Kowalski's] office." Kowalski insisted that Ms. Norton's child would

---

[9] While Defendants never provided Ms. Norton with factual support for their accusations, the SIU report appears to have concluded that Ms. Norton violated an unidentified employment policy by (1) submitting D.N.'s athletic participation paperwork as her parent and (2) not actively working to change D.N.'s sex designation in TERMS [the Broward County Public Schools database] after she became a District employee.  Notably, changing D.N.'s sex designation in the TERMS database, after July 2021, would have resulted in a situation in which the school database listed D.N. as "Male," while her state issued birth certificate identified her as "Female."  In any event, the Investigation did not focus on the facts surrounding either theory.

need to find another way home because Mr. Norton would not be permitted to pick her up. Ms. Norton was escorted off campus.

87.     Defendant Kowalski also admonished Ms. Norton to refrain from communicating with anyone about the Investigation and assured her that it would remain confidential in accordance with District policy.

88.     Despite Defendant Kowalski's assurances, within two hours of the completion of the November 27 meeting, Ms. Norton's name, work location, her daughter's school location, and allegations in the Investigation were widely published across local and national news media, including NBC 6 South Florida, WSVN, The New York Post, and CNN.

89.     On information and belief, Broward County School District officials confirmed details identifying Ms. Norton in those news reports, in violation of District policy that requires employee investigations to remain confidential.

90.     Ms. Norton's daughter D.N. also left school that day and has not returned to Monarch High School's campus as of the date of this filing.

91.     No one from Monarch High School or the District responsible for D.N.'s school has ever followed up with the Norton family to inquire about D.N.'s well-being or her extended absence from school.

92.     In the days and weeks following the announcement of the Investigation, Ms. Norton and her family endured traumatic stress as the result of anonymous obscene voicemails and text messages, surveillance by neighbors and media, and online harassment.

93.     Out of fear for their physical safety, Ms. Norton's family had a police car parked outside of their home for several weeks.

VI.    **SIU/DOE's Investigation Was Motivated by Anti-Transgender Animus and Part of a Course of Conduct Designed to Retaliate Against Ms. Norton for Exercising her First Amendment Rights**

94.    On information and belief, the SIU and DOE's investigation and resulting reports were part of a course of conduct by all Defendants to harass and retaliate against Ms. Norton for exercising her First Amendment right to petition the government for redress of discrimination against her transgender daughter in violation of Title IX.

95.    The wide-ranging scope and imprecision of the Joint SIU and DOE Investigation ("the Investigation") and resulting reports evidence their improper motivation.

96.    The Investigation was not designed to determine whether Ms. Norton took improper action as a Monarch High School employee.

97.    The majority of the Investigation was wholly unrelated to Ms. Norton's employment at Monarch High School (including inquiries into the Underlying Lawsuit), and the Investigation was disproportionate to the Defendants' pretextual accusations, namely, that a parent did not take affirmative steps to change information in the District student information system.

98.    The scope of the SIU Investigation was under Defendant Kowalski's control.

99.    On information and belief, Defendant Kowalski's decisions as to the breadth of the SIU Investigation were not subject to meaningful review.

100.   On information and belief, Defendants Honan and Tello acted pursuant to their discretionary authority in carrying out the SIU Investigation within the scope prescribed by Defendant Kowalski.

101.    On information and belief, Defendant Tello's and Honan's harassing lines of inquiry during depositions of Ms. Norton were not subject to meaningful review because they caused harm to Ms. Norton.

**A.  The Joint SIU and DOE Investigation Focused on Ms. Norton's Past Actions as a Parent of an Elementary School and Middle School Student**

102.    During the Investigation, the SIU and DOE collectively interviewed at least 16 individuals, including Ms. Norton:  six were employees of D.N.'s elementary and middle schools, four were employees of Monarch High School, and three were children.[10]

103.    Although Defendants were purportedly investigating the violation of a law enacted in 2021, the SIU's first and immediate focus was on the elementary and middle schools that Ms. Norton's daughter attended in years prior to 2020.

104.    Ms. Norton never worked at either the elementary school or the middle school her daughter attended and never had access to those schools' databases.

105.    As a result, much of the Investigation was related to Ms. Norton's parenting, her beliefs, and her perceived advocacy—not her job.

106.    On November 30, 2023, SIU contacted and interviewed Carolyn Eggleston, Principal of Winston Park Elementary "to obtain further information about [D.N.'s] gender change" in the school records system.  They also questioned Mary Williams, the elementary school's information management specialist.

107.    Ms. Williams made false statements that were relied on in the Investigative Reports, but Ms. Williams later retracted her statements and was investigated for dishonesty.

---

[10] The full scope of the Investigation, including transcripts of SIU/DOE interviews, was described in the SIU's Investigative Report, released on February 14, 2024.

18

108.    Detective Tello was aware of these developments, but confirmed to Ms. Norton's counsel that she would not amend the Investigative Report or inform the School Board and DOE that the Investigative Report included false information.

109.    On December 4, 2023, an article was published in the Florida Sun Sentinel concerning the SIU's investigation of Ms. Norton.  The same article noted that Ms. Norton had previously filed a suit challenging SB 1028.

110.    Later that day, Defendant Broward County School Board member Brenda Fam emailed Florida DOE representatives Terry Stoops and Paul Burns to raise a "serious concern[]" that "a transgender boy [was] knowingly playing volleyball on a girl's [sic] team."  Ms. Fam pointed to news coverage, including the articles that mentioned the Underlying Lawsuit in connection with Ms. Norton's name.

111.    On information and belief, as of December 4, it was clear to Ms. Fam and the Florida DOE that Ms. Norton was the person who had filed the Underlying Lawsuit.

112.    Later that same day, the Florida DOE notified the SIU that they planned to send an investigator, Clinton Albritton (Program Director of the Florida Department of Education), to join the SIU's investigation.

113.    On information and belief, DOE's decision to intervene was motivated by Ms. Norton's lawsuit and coverage of what DOE perceived as her advocacy.

114.    On December 8, 2023, Terry Stoops, a recent hire by the Florida DOE, reported back to Defendant Fam that he "met with Chancellor Burns to discuss these issues, and we plan on chatting with our General Counsel later today."

115.    Chancellor Paul Burns was the Deputy Chancellor for Educator Quality, employed by the Florida DOE.

116.    Subsequently, on December 11, 2023, one week after the Florida Sun Sentinel article was published, and forwarded to the DOE by Brenda Fam, the DOE notified Ms. Norton that it had opened an investigation of her for "inappropriate conduct."

117.    On December 13, 2023, SIU and DOE investigators went to D.N.'s middle school to "obtain all athletic documents."  They questioned the middle school Assistant Principal Traci Aveni and former middle school athletic director Ralph Rubiano.

118.    Mr. Rubiano confirmed that he was aware that a transgender girl participated in sports at the middle school and added that "everyone knew."

119.    Following these initial middle school interviews, the SIU and DOE expanded the Investigation to include Vernicca Wynter, Traci Aveni, and Ralph Rubiano.

120.    On information and belief, these individuals were never disciplined by the School Board or the Florida Department of Education.

121.    The SIU and DOE then expanded their investigation of documents at the middle school, confirming through review of emails that there were "transgender students . . . attending Lyons Creek Middle School during the 2021/2022 school year."

122.    The SIU also later interviewed the Lyons Creek Middle School Guidance Director concerning D.N.'s time at the middle school.

123.    No employee of the middle school was disciplined following the investigation.

**B. Rather than Inquiring Into Ms. Norton's "Official Duties," SIU's Interview of Ms. Norton Focused on Her Parenting and Perceived Advocacy, Including Her Decision to File the Underlying Lawsuit**

124.    At the end of January 2024, nearly two months after initiation of the Investigation, the SIU called Ms. Norton to schedule an interview.

20

125.    Ms. Norton's interview was conducted under oath. Detective Tello advised Ms. Norton that she was "being questioned as part of an official investigation for the School Board of Broward County."

126.    Detective Tello told Ms. Norton that she would be "asked questions specifically, directly and narrowly related to the performance of your official duties or fitness for duty."

127.    The subsequent interview focused on matters entirely outside the scope of Ms. Norton's employment and were seemingly unrelated to her fitness for duty as an Information Management Specialist.

128.    For example, Defendant Tello questioned Ms. Norton about whether she engaged a lawyer or sought legal advice "based on [her] child's transgender position."



129.    Defendant Tello also asked Ms. Norton about the Underlying Lawsuit challenging SB 1028 and its outcome.



130.    Defendants also asked Ms. Norton about the "lawsuit that she filed against Governor

Desantis on or around June 29, 2021."  In their "Summary of Investigation", they noted that

the case was dismissed in November 2023 but then refiled and remained pending.[11]

131.    In fact, they labeled this Court's decision dismissing the Complaint in the Underlying

Lawsuit as "Documentary Evidence" and attached it as an Exhibit to the SIU's Investigative

Report.

---

[11]     As noted above, Ms. Norton signaled an intention to file an Amended Complaint on November 16, 2023
when she moved for an extension of time to file an Amended Complaint and filed that Amended Complaint on January
11, 2024.

132.    Detective Tello asked Ms. Norton about "being an advocate," on behalf of her daughter.

> 11
> 12  DETECTIVE TELLO:    Okay. Based on witness testimony that we took, when
> 13  we interviewed people that were at Winston Park Elementary, you were
> 14  considered to have a reputation as being very demanding, an assertive person
> 15  when it came to affairs related to your child. Would you say that's an accurate
> 16  statement as far as being an advocate, would you say that that's a fair
> 17  statement?
> 18
> 19  JESSICA NORTON:    I'm a parent.
> 20
> 21  DETECTIVE TELLO:    Okay. Would you say that you were a vocal advocate,
> 22  like a big advocate for your child during that ...
> 23
> 24  JESSICA NORTON:    For all three of my children.
> 25

133.    Detective Tello also asked other employees about Ms. Norton's actions as a perceived advocate for her child:

> 13  DETECTIVE THOMAS HONAN:  Now in your experience with Jessica Norton,
> 14  did you feel that she was maybe overbearing or pushing when it came to
> 15  advocating for ████████?
> 16
> 17  JAMES CECIL:    No.
> 18

134.    Defendant Tello asked about Ms. Norton's decision to have D.N.'s birth certificate and name legally changed.

135.    Defendant Tello also asked Ms. Norton, "why [she] dress[ed] [her child] like a girl when he was a boy," misgendering D.N.

136.    Defendant Honan asked Ms. Norton about her conversations with friends and her child's classmates, schoolteachers, coaches, and principals concerning her child's gender.

137.    These questions and the decision to append information concerning the Underlying Lawsuit revealed the true nature of SIU's investigation: it was an investigation of Ms. Norton's lawsuit and perceived advocacy, and it was launched in retaliation for that lawsuit and perceived advocacy.

**C. Rather Than Focusing on Actions Taken by Ms. Norton as an Employee, Defendants' Investigation Also Focused on D.N.'s Physical Appearance**

138.    During both Ms. Norton's interview and the interviews of others, Defendants Honan and Tello showed disdain for D.N. and an inappropriate, misguided, and irrelevant interest in her physical appearance and interactions in locker rooms with other minor students.

139.    Adults interviewed in connection with the Investigation were asked about D.N.'s physical appearance, including whether D.N. looked like a girl.

140.    For example, Defendant Honan asked principal James Cecil about D.N.'s weight and hair length.  (The below excerpt refers to Ms. Norton's daughter as J.S.)

| | |
|---|---|
| DETECTIVE HONAN: | So based on your observations, you thought she was talking about . . . because when you saw [J.S.], what did [J.S.] look like?  That's why I was asking you earlier to be specific about. . . |
| JAMES CECIL: | A girl. |
| DETECTIVE HONAN: | Describing [J.S.]? |
| JAMES CECIL: | Yeah a girl in every way.  I don't know. . . |
| DETECTIVE HONAN: | So describe [J.S.] to me. |

| | |
|---|---|
| JAMES CECIL: | I don't know, she's got long hair.  She's got. . . she's frail for lack of a better term.  I mean she looks like a girl to me. I don't know how to explain that. |
| DETECTIVE HONAN: | Light weight? |
| JAMES CECIL: | Small, like I said frail.  She seems very small, very skinny. Average height I guess. |
| DETECTIVE HONAN: | Long hair, short hair? |
| JAMES CECIL: | Long hair. |

141.    Children interviewed by Defendants Tello and Honan were asked whether they changed in front of D.N. and how they felt about her transgender status.

142.    For example, in the excerpt below, Defendant Tello asked one minor student whether she was "unclothed in front of" D.N.

24



143.    In their prior review of emails and text messages relating to the case, Defendants highlighted an email from D.N.'s elementary school PE teacher highlighting the fact that it was D.N.'s "fear that someone will 'out' her and she is always on edge when it comes to gender issues."  But investigators showed no concern for whether they were "outing" D.N. to her classmates, friends, and community.

144.    These lines of inquiry had no bearing on the school district's accusations.

145.    On information and belief, the purpose of these inquiries was to harass and retaliate against Ms. Norton and her family for filing the Underlying Lawsuit rather than to investigate an employee's actions.

146.    Moreover, these lines of inquiry demonstrate that the purpose of the Investigation was to create a pretext for retaliatory employment action against Ms. Norton for filing the Underlying Lawsuit rather than to investigate actual wrongdoing.

147.    Likewise, Defendants' persistent misgendering of Ms. Norton's child during her interview, despite multiple corrections, evinces Defendants' animus toward transgender people and their allies.  Throughout Ms. Norton's January 2024 interview, both Defendants Honan

and Tello repeatedly referred to D.N. as "he," "him," or "your son" despite consistent correction from Ms. Norton and her counsel.

148. This animus was further evidenced during a related Investigation interview with Principal James Cecil, in which Defendant Honan referred twice to D.N. as "it."

## VII. The School Board and DOE Used the SIU/DOE Investigation to Take Retaliatory Employment Action Against Ms. Norton

149. On February 14, 2024, SIU issued a 502-page Investigative Report, authored by Defendant Tello and reviewed and signed by Defendant Kowalski and Kevin Nosowicz, a Lieutenant at SIU.

150. On March 1, 2024, SIU issued a supplemental report with additional information regarding events that occurred while D.N. was in elementary school. This report was also authored by Defendant Tello and reviewed and signed by Defendant Kowalski and Kevin Nosowicz.

151. On March 18, 2024, Ms. Norton provided a detailed written response to the SIU Investigation to the SIU, including Defendants Kowalski and Tello, with supporting declarations from additional witnesses, refuting material factual findings in the Report.

### D. The Broward County School Board Delayed Unnecessarily in Voting on Ms. Norton's Discipline

152. The Broward County School Board's Public Schools Professional Standards Committee ("PSC") is appointed by the Superintendent and is composed of employees of the School Board.[12]

153. The PSC is tasked with making recommendations to the Superintendent concerning employee discipline.

---

[12] http://www.broward.k12.fl.us/sbbcpolicies/docs/P4.9.000.pdf

154.    On March 20, 2024, the PSC recommended that Ms. Norton receive a 10-day suspension.

155.    On March 26, 2024, Defendant David Azzarito, Superintendent Hepburn's designee, declined to follow the recommendation without explanation.

156.    Defendant Azzarito instead recommended that the School Board terminate Ms. Norton's employment.  Again, he provided no explanation.

157.    On March 27, 2024, Ms. Norton received a Notice from SIU which indicated that the PSC had recommended termination of Ms. Norton's employment.

158.    Only later would Ms. Norton discover, through news reporting, that the PSC had in fact recommended a 10-day suspension and that Defendant Azzarito, acting as Defendant Hepburn's designee, had changed the PSC's recommendation from suspension to termination.

159.    Ms. Norton was informed that the Superintendent's recommendation for termination of her employment would be considered by the School Board at the May 21, 2024 meeting.

160.    However, the School Board delayed consideration of the recommendation until the June 18, 2024 meeting.

161.    Three days prior to its June 18, 2024 meeting, the School Board again delayed consideration of the recommendation until the July 23, 2024 meeting without explanation.

162.    The District failed to notify Ms. Norton that her matter was being removed from consideration at the June 18 meeting until after the meeting had occurred.

163.    During this delay, Ms. Norton's one-year contract with Broward County Public Schools expired.  On information and belief, all School District employees are employed on one-year contracts.

164.    On June 18, 2024, Ms. Norton was informed that Broward County Public Schools had renewed her contract.  Ms. Norton never received a copy of this alleged employment contract.

165.    Defendant Hepburn, Defendant Azzarito, and Marylin Batista repeatedly ignored requests from Ms. Norton to clarify the nature and intent of the purported contract renewal.

166.    After weeks of silence, counsel for Broward County Public Schools replied that they "acknowledged" receipt of Ms. Norton's questions.  No further information was provided.

167.    At the July 23, 2024 meeting, the School Board again delayed consideration of the Superintendent's recommendation, in part to gather information about other disciplinary measures that the School Board had recently taken.

   **A.  The School Board scheduled a special meeting on July 30, 2024 to consider Ms. Norton's fate. While Ms. Norton Awaited Final Decision, School Board Members Began to Spread Disinformation**

168.    School Board Member Brenda Fam began publicly commenting on the investigation of Ms. Norton as well as on the School Board and DOE's efforts to discipline Ms. Norton – before Ms. Norton's discipline had been decided.

169.    In a Facebook post published four days before the School Board was scheduled to vote on Ms. Norton's discipline, Defendant Fam falsely stated that Ms. Norton asked a "co-worker" to change D.N.'s gender in school records.

170.    As detailed above and corroborated by the SIU's own report, Ms. Norton was not a Broward County Public Schools employee at the time D.N.'s gender was changed in the school records system.

171.    Defendant Fam's Facebook post also distorts the timeline of events.

172.    D.N. was not in high school, and SB 1028 did not exist at the time D.N.'s gender marker was changed in the District's student information system.

28

173.   Defendant Fam's post also suggests that Ms. Norton coached D.N.'s sports team, but that was not the case.

174.   While it is accurate that Ms. Norton coached sports at Monarch High, she never coached D.N.'s team.

175.   Defendant Fam's post, which includes a solicitation for outreach from parents based on their children's emotional distress from losing out to D.N. for the title of prom queen, evidence not only disregard for the basic timeline of events—to which she had access through the SIU's Report—but also animus towards Ms. Norton and her daughter.



176.   Defendant Fam's post two days later clarified that her animus against Ms. Norton included indignation that Ms. Norton brought the Underlying Lawsuit for discrimination on behalf of her daughter.

177.    In a Facebook post on July 29, Defendant Fam specifically linked the dismissal of the

Underlying Lawsuit to the Florida DOE's related investigation.



178.    School Board Member Brenda Fam is an attorney and reasonably expected to be

familiar with the protections of the United States Constitution.

179.    Defendant Fam understood that her efforts to encourage the Board to retaliate against

Ms. Norton for filing the Underlying Lawsuit violated Ms. Norton's constitutional rights.

**B. Comments by the School Board Confirm the Retaliatory Purpose of their Disciplinary Actions Against Ms. Norton**

180.    On July 30, 2024, the School Board met to consider Ms. Norton's employment.

181.    During that meeting, Debra Hixon, the board member who first made the motion to

suspend Ms. Norton for ten (10) days, stated that "the discipline here is not for changing

records.  It is for being a coach and not following the law[.]"

182.    Ms. Norton never coached any of her daughter's school sports teams.

183.    Board Member Torey Alston stated that he believed Ms. Norton should be disciplined because she "[a]lter[ed] information without permission or authorization as a school district employee."

184.    However, Defendant Hepburn later confirmed that the school district had "*no specific hard evidence*" that Ms. Norton "used her access to student records as an employee to falsify student records."

185.    In fact, Ms. Norton was not a Broward County School District employee and consequently did not have access to student records at the time D.N.'s school records were changed.

186.    During the same school board meeting, Ms. Batista specified that "the allegation that is before [the School Board] is related to the employee . . . allowing something that she knew was incorrect to move forward," presumably referring to the fact that Ms. Norton did not change her daughter's gender in the school system *back* to male.

187.    Sarah Leonardi, the board member who seconded the motion to suspend Ms. Norton for ten (10) days, recognized the inconsistencies in the basis for Ms. Norton's discipline, stating that she received "different explanations, and [had been] pointed to different actions about why [Ms. Norton was] being disciplined."

188.    Ms. Batista confirmed during the school board meeting that Ms. Norton was "the first person recommended for termination under the Fairness in Women's Sports Act."

189.    The School Board was aware that it had not disciplined any other employees for a violation of the Fairness in Women's Sports Act.

190.    During the July 30 meeting, the School Board reviewed recent disciplinary measures that the School Board had taken against other Broward County School employees.

191.   School Board members acknowledged that other educators who received 10-day suspensions had, in several instances, physically harmed students.

192.   Board Member Allen Zeman summarized several disciplinary measures, ranging from a three (3) day suspension for inappropriate behavior with children to a ten (10) day suspension for child abuse.

193.   Board Member Torey Alston noted that while these other individuals should have been punished more harshly, the severity of their discipline should not prevent the School Board from issuing similar or harsher discipline to Ms. Norton.

194.   The School Board was aware that its discipline in this matter differed from the standards it had applied to prior disciplinary actions.

195.   On information and belief, the explanations offered for Ms. Norton's discipline were pretextual.

196.   On information and belief, Ms. Norton was disciplined for actions she took as a parent to protect the rights of her transgender daughter.

197.   The School Board retaliated against Ms. Norton for her speech under color of state law.

198.   As Ms. Leonardi explained "we have a law that we have to follow."

199.   Defendant Fam went further, stating that Ms. Norton's actions were "criminal in my opinion."

200.   SB 1028 is not a criminal statute.

201.   During the July 30 meeting, Defendant Fam also repeatedly referred to Ms. Norton's daughter as "her son."  D.N. is a girl.

202.   Ms. Fam further made several misrepresentations during this meeting.  For example, she misrepresented the penalty issued by the Florida High School Athletic Association.  She

claimed that the volleyball team was "disqualified" because D.N. played on the team during the 2022-2023 school year.  It was not.

203.    More importantly, Ms. Fam also publicly and directly questioned Ms. Norton's decision to bring the Underlying Lawsuit.

204.    Ms. Fam suggested that Ms. Norton was being "deceptive" in allowing her daughter to play volleyball and stated that:  "And then she turned around and filed a lawsuit to make sure that her child stayed in the female sports.  Now, if she wasn't doing something she didn't think she had the legal right to do, then why file a lawsuit?  Why would you do that?"  Ms. Fam knows better.  She is a member in good standing of The Florida Bar and should understand that challenging government action under the civil rights laws is not evidence of culpability.  Her knowingly false statements in the charged and public setting of the School Board meeting indicate an abuse of her office and personal animus.

205.    Ms. Norton filed the Underlying Lawsuit to defend her daughter's rights.  Ms. Norton's action is protected by the First Amendment and Title IX.

### C.  The Broward County School Board Suspended Ms. Norton and Reassigned Her to a Position with Lower Earnings Potential

206.    Defendant School Board knowingly relied on the improper and factually incorrect Investigation and findings of SIU and DOE, in order to retaliate against Ms. Norton for her perceived advocacy, including her decision to file, and refile, the Underlying Lawsuit.

207.    On July 30, 2024, a majority of the School Board voted to suspend Ms. Norton for 10 days without pay and prohibited her from returning to her employment as an Information Management Specialist at Monarch High.

208.    Ms. Norton was reassigned to a clerical position in the Buildings Department, despite expressing a strong desire and willingness to collaborate with District officials to remain at her school location so that D.N. could return to in-person school.

209.    Ms. Norton's reassignment to the Buildings Department was effectively a demotion and forced her to start over at a new position, leaving behind a job defined by a supportive community familiar with her capabilities for an environment where she would need to prove herself all over again and where the work was unfamiliar, as well as less personally and financially rewarding.

210.    Ms. Norton's prior position at Monarch High provided the opportunity to earn supplemental income from activities such as coordinating free and reduced meals for eligible students and acting as a student advisor.

211.    Over the last few years, Ms. Norton earned roughly an additional 36% in take-home pay through those supplemental activities.

212.    In contrast, the position to which Ms. Norton was reassigned does not provide such opportunities for supplemental income.

213.    Ms. Norton's commute to her position at the Buildings Department, 15 miles from her house, was also approximately 30 minutes longer each way than her prior commute to Monarch High, which was less than two miles from her house.

**VIII.    Florida DOE Retaliates Against Ms. Norton Based on the Same Improper Investigation**

214.    As noted in the SIU Investigative Report, the DOE participated in the SIU's investigation of Ms. Norton from December 2023 forward and relied on SIU's investigation and subsequent report to justify its retaliatory actions against Ms. Norton.

215.    On March 27, 2024, the Florida DOE, through Clinton Albritton (Investigator), notified Ms. Norton that the Florida DOE had "concluded its preliminary investigation."

216.    The DOE's 530-page Investigative Report, issued April 3, 2024, contains the Broward County SIU's 502-page Investigative Report in its entirety.

217.    Given the Florida DOE's participation in and reliance on the SIU's investigation and report, DOE's investigation was similarly overbroad in scope.  It focused on Ms. Norton's parenting—including her decision to file the Underlying Lawsuit on behalf of her daughter—rather than on her activities as an employee.

218.    On April 15, 2024, Mr. Albritton of the DOE held an informal conference with Ms. Norton's counsel.

219.    During that meeting, Mr. Albritton provided procedural information regarding the next steps in the investigatory and adjudication process and invited Ms. Norton's counsel to ask questions about the DOE investigation.

220.    Ms. Norton's counsel made several inquiries regarding the substance of the Investigation, including the basis for the Florida DOE's jurisdiction to investigate or discipline Ms. Norton and whether the Florida DOE had independently collected or reviewed any information relevant to the misconduct allegations.

221.    Mr. Albriton did not provide responses to these questions.

222.    On May 7, 2024, Ms. Norton provided a detailed written response to the DOE Investigation to Clinton Albritton of the Florida DOE, including providing supporting declarations from additional witnesses, refuting material factual findings in the Report.

223.    On May 28, 2024, Defendant Manny Diaz Jr., the Commissioner of Education, notified Ms. Norton that the Florida DOE had found "probable cause" to "justify sanctions against [Ms. Norton's] Florida educator certificate."

224.    Defendant Diaz identified, as potential penalties—reprimand, fine, probation, restriction of the scope of practice, suspension not to exceed five years, revocation not to exceed 10 years, or the permanent revocation of Ms. Norton's Educator Certificate.

225.    Defendant Diaz knowingly relied on the improper and factually incorrect Investigation and findings of SIU and DOE in order to retaliate against Ms. Norton for her perceived advocacy, including her decision to file, and refile, the Underlying Lawsuit.

226.    Upon information and belief, Defendant Diaz did not find probable cause to justify sanctions against any other educator at Monarch High School.

227.    Based on the finding, Defendant Diaz filed an administrative complaint against Ms. Norton seeking unspecified sanctions against her coaching certificate.

228.    The administrative complaint alleged that during the 2021/2022 and 2022/2023 school years, Ms. Norton facilitated the placement of her child on girls' high school sport teams.

229.    It was widely known at Lyons Middle School (where Ms. Norton's daughter was enrolled for the 2021/2022 school year) and at Monarch High School that Ms. Norton's daughter is transgender.

230.    Defendant Diaz did not bring any action against other educators in connection with Ms. Norton's daughter's participation on these teams.

231.    Upon information and belief, other educators at Monarch High School, including D.N.'s volleyball coach, were aware that she is transgender.

232.    The administrative complaint alleged that Ms. Norton "fraudulently completed required forms for enrollment in school and participation in school sports."

233.    Ms. Norton completed all required forms in conformity with the information on her daughter's birth certificate, as is expected of every parent during enrollment.  D.N.'s birth certificate, issued by the State of Florida, lists her gender marker as female.

234.    The administrative complaint alleged that while Ms. Norton's "child was in the second grade . . . Ms. Norton inappropriately requested and pressured Mary Williams . . . to change [Ms. Norton's] child's gender in the school data base without required documentation from male to female."

235.    Ms. Williams retracted these statements and was investigated for her dishonesty.

236.    As described above, Ms. Norton requested that her daughter's gender marker be changed consistent with the District policy as explained to her by the Superintendent Runcie.  Ms. Norton spoke with Assistant Principal Traci Porter, who changed D.N.'s sex designation to female in the student information system.

237.    Ms. Norton made this request in 2016 before she was ever employed by any Broward County School and before she applied for and was granted her educator's certificate.

238.    Ms. Norton made this request before the enactment of SB 1028 on July 1, 2021.

239.    The allegations offered in support of Defendant Commissioner Diaz's complaint are pretextual.

240.    On information and belief, the true purpose of Defendant Diaz's prosecution was to retaliate against Ms. Norton.

241.    On August 1, 2024, the Florida DOE offered Ms. Norton a settlement agreement that called for the harshest available penalty—permanent revocation of her coaching certificate and a permanent bar to re-applying for any educator's certificate in the State of Florida.

242.    Other examples of conduct where the Florida DOE has ordered revocation of an educator's certificate include a respondent who was found guilty of 324 counts of video voyeurism (Oct. 2023), a respondent who sexually harassed a colleague (May 2016), a respondent who committed four (4) counts of sexual battery on a child (Mar. 2016), a respondent who conspired to distribute controlled substances (Mar. 2020), and a respondent who struck a first grade student as a form of discipline (Nov. 2013).[13]

243.    In contrast, in 2011, the Florida DOE ordered a letter of reprimand, two years probation, and a $500 fine where the respondent was charged with Driving Under the Influence, told another teacher that he shot his gun and pictured students and administrators as targets, used pictures of students as target practice, and told another teacher that "they should worry about me shooting up the place."[14]

244.    On September 12, 2024, Ms. Norton rejected the Florida DOE's offer of settlement.

**IX.    Conclusion**

245.    Defendants' actions were motivated by anti-transgender animus and were designed to punish Ms. Norton for exercising her First Amendment right to petition the government for redress and her rights under Title IX to report inequity.

246.    The timing and substance of Defendants' investigation into Ms. Norton's conduct, along with the implementation of discipline based on that investigation, confirm that

---

[13] Florida DOE Case. No. 23-0264-RT (Oct. 2023); Florida DOE Case. No. 15-0658-RA (May 2016); Florida DOE Case. No. 15-0552-TC (March 2016); Florida DOE Case. No. 19-0258-TC (Mar. 2020); Florida DOE Case. No. 13-0344-RT (Nov. 2013).
[14] Florida DOE Case No. 16-0647-RT (Aug. 2011).

Defendants acted to retaliate against Ms. Norton for filing the Underlying Lawsuit to challenge a law that adversely affected her child and which she believed violated Title IX.

## CLAIMS OF RELIEF

### COUNT I
### Violation of the First Amendment to the United States Constitution

### (Against Defendant Manny Diaz, in His Official Capacity as
### Commissioner of the Florida Department of Education)

247.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

248.    Plaintiff Ms. Norton has a right to freedom of speech, including but not limited to the right to petition the government for redress under the First Amendment of the United States Constitution.

249.    Plaintiff engaged in activity protected by the First Amendment.  Specifically, Ms. Norton advocated on behalf of her daughter, including by way of the Underlying Lawsuit, which she brought as a private citizen to redress her daughter's specific circumstances and the circumstances of other students in the state.

250.    Defendant took adverse actions against Plaintiff.  These adverse actions include launching a lengthy, intrusive, wholly disproportionate, and harassing investigation into her conduct.  Defendant Diaz used the improper Investigation to find "probable cause" to justify sanctions against Ms. Norton's Educator's Certificate and prosecution of an administrative complaint seeking sanctions up to and including permanent revocation.

251.    There is a causal connection between Plaintiff's protected activity and Defendant's adverse actions.  As detailed above, Defendant Diaz initiated a DOE's investigation shortly after Ms. Norton signaled an intent to file an amended complaint in the Underlying Lawsuit and immediately after Ms. Norton spoke out publicly on behalf of her daughter and other transgender children in an article mentioning the Underlying Lawsuit.

252.    Defendant's improper investigation, which was co-extensive with Defendant Broward County School Board's investigation, focused on Ms. Norton's First Amendment activities,

40

including her Underlying Lawsuit.  The Florida DOE's investigative report even attached this Court's order dismissing the Underlying Lawsuit without prejudice as "documentary evidence."  Defendant Diaz unlawfully singled out Ms. Norton for sanctions; explanations offered in support of those sanctions were pretextual.

253.     As a direct and proximate result of Defendant's unreasonable and unlawful conduct, Plaintiff has suffered and continues to suffer substantial past and future damages including loss of income, loss of future earnings, severe emotional distress, damage to reputation, and embarrassment.

254.     Plaintiff seeks injunctive relief against Defendant Commissioner Manny Diaz to enjoin his prosecution of sanctions against Plaintiff's Educator's Certificate.   In the alternative, Plaintiff seeks injunctive relief against Defendant Commissioner Manny Diaz to enjoin the revocation of Plaintiff's Educator's Certificate.

**COUNT II**
**Violation of the First Amendment – 42 U.S.C. §1983**
**(Against Defendant Broward County School Board)**

255.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

256.    Plaintiff engaged in activity protected by the First Amendment.  Specifically, Ms. Norton advocated on behalf of her daughter, including by way of the Underlying Lawsuit, which she brought as a private citizen to redress her daughter's specific circumstances and the circumstances of other students in the state.

257.    Defendant has taken adverse actions against Plaintiff.  These adverse actions include, but are not limited to, launching a lengthy, intrusive, harassing, and wholly disproportionate investigation into her conduct, temporarily reassigning Plaintiff to an unfavorable position with no relation to her prior responsibilities, publicly escorting her off the grounds of the school where she worked, suspending her without pay for a period of 10 days, and permanently reassigning her to a less desirable work location without opportunities to earn supplemental income, all of which effectively excluded Plaintiff from the school community.

258.    Defendant acted under the color of state law.  Defendant used the resources of the school district and purported to apply school policies to retaliate against Plaintiff for exercising her First Amendment right to petition.

259.    There is a causal connection between Plaintiff's protected activity and Defendant's adverse actions.  Defendant caused an investigation to be opened into Plaintiff days after Plaintiff signaled her intention to file an amended complaint in the Underlying Litigation. During the course of this investigation pursuant to Defendant's direction, Defendant's representatives focused on Plaintiff's advocacy on behalf of her child, including but not limited to filing the Underlying Complaint, and attached this Court's decision dismissing the

42

Underlying Complaint to the Investigative Report.  Moreover, members of Defendant School Board discussed Plaintiff's advocacy, including but not limited to her Underlying Lawsuit, at meetings at which they discussed and ultimately voted to suspend Plaintiff.

260.    As a direct and proximate result of Defendant's unreasonable and unlawful conduct, Plaintiff has suffered and continues to suffer substantial past and future damages including loss of income, loss of future earnings, severe emotional distress, damage to reputation, and embarrassment.

261.    Plaintiff seeks injunctive relief enjoining Defendant Broward County School Board from prohibiting Plaintiff's return to work at Monarch High.

262.    Plaintiff further seeks damages for lost wages including future earnings, costs and reasonable attorneys' fees, and such other relief as this Court may deem just and proper.

**COUNT III**
**Violation of the First Amendment – 42 U.S.C. §1983**

**(Against Individual Defendants David Azzarito, Howard Hepburn, Thomas Honan, Craig Kowalski, Holly Tello, and Brenda Fam, in Their Individual Capacities)**

263.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

264.    Plaintiff engaged in activity protected by the First Amendment.  Specifically, Ms. Norton advocated on behalf of her daughter, including by way of the Underlying Lawsuit, which she brought as a private citizen to redress her daughter's specific circumstances and the circumstances of other students in the state.

265.    Defendants have taken adverse actions against Plaintiff.  These adverse actions include removing Plaintiff from the school where she worked and that her daughter attended, launching a lengthy, intrusive, harassing, and wholly disproportionate investigation into her conduct, suspending her without pay for a period of 10 days, initially reassigning her to a position with no relation to her prior responsibilities, and finally reassigning her to a less desirable work location, with no opportunity to earn supplemental income through her job.

266.    In addition, Defendants Kowalski, Tello, Honan, and Fam harassed and intimidated Plaintiff.  Defendants Azzarito and Hepburn knowingly relied on an improper Investigation and Report to recommend Plaintiff be terminated.

267.    There is a causal connection between Plaintiff's protected activity and Defendants' adverse actions.  As detailed above, Defendants opened the Investigation into Plaintiff and escorted Plaintiff off the grounds of the school where she worked just five days after Plaintiff signaled an intention to file an amended complaint in the Underlying Lawsuit, raised the fact of the Underlying Lawsuit several times during the course of their investigation, attached the order dismissing the Underlying Lawsuit without prejudice to their Investigative Report, and members of Defendant School Board discussed Plaintiff's perceived advocacy, including but

44

not limited to her Underlying Lawsuit, at meetings at which they discussed and ultimately voted to suspend Plaintiff.

268.    Defendants acted under the color of state law.  Defendants used the resources of the school district and purported to apply school policies to retaliate against Plaintiff for exercising her First Amendment right to petition.

269.    Defendants' conduct violated clearly established constitutional and statutory rights of which the Defendants knew and/or of which a reasonable school official should have known.

270.    As a direct and proximate result of Defendants' unreasonable and unlawful conduct, the Plaintiff has suffered and continues to suffer substantial past and future damages including loss of income, loss of future earnings, severe emotional distress, damage to reputation, and embarrassment.

271.    Plaintiff seeks damages, costs and reasonable attorneys' fees, and such other relief as this Court may deem just and proper.

**COUNT IV**
**Violation of 20 U.S.C. § 1681**
**(Title IX of the Education Amendments of 1972)**

**(Against Defendant Broward County School Board)**

272.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

273.     Title IX of the Education Amendments of 1972 prohibits discrimination "on the basis

of sex. . . under any education program or activity receiving Federal financial assistance." Title

IX also prohibits retaliation against any individual for complaining about conduct which they

had a good faith and reasonable basis to believe constituted a Title IX violation.

274.     Plaintiff brought a complaint against the Defendant for sex discrimination against her

daughter, in violation of 20 U.S.C. § 1681.

275.     At the time Plaintiff filed suit, she had a good faith and objectively reasonable basis for

believing that Defendants' actions constituted violations of Title IX.

276.     Defendant has taken materially adverse actions against Plaintiff.  These adverse actions

include banning Plaintiff from the school where she worked and that her daughter attended

during the course of the Investigation, launching a lengthy, intrusive, harassing, and wholly

disproportionate investigation into her conduct, suspending her without pay for a period of 10

days, initially reassigning her to a position with no relation to her prior responsibilities, and

finally reassigning her to a less desirable work location with no opportunity to earn

supplemental income through her job.

277.     Defendant's actions would have dissuaded a reasonable worker from making a charge

of discrimination under Title IX.

278.     There is a causal connection between Plaintiff's protected activity and Defendant's

adverse actions.  Defendant caused an investigation to be opened into Plaintiff days after

Plaintiff signaled her intention to file an amended complaint in the Underlying Litigation.

During the course of this investigation pursuant to Defendant's direction, Defendant's representatives focused on Plaintiff's advocacy on behalf of her child, including but not limited to filing the Underlying Complaint, and attached this Court's decision dismissing the Underlying Complaint to the Investigative Report.  Moreover, members of Defendant School Board discussed Plaintiff's advocacy, including but not limited to her Underlying Lawsuit, at meetings at which they discussed and ultimately voted to suspend Plaintiff.

279.    As a direct and proximate result of Defendant's unreasonable and unlawful conduct, the Plaintiff has suffered and continues to suffer substantial past and future damages including loss of income, loss of future earnings, severe emotional distress, damage to reputation, and embarrassment.

280.    Plaintiff seeks an injunction against Defendant Broward County School Board enjoining Defendant from prohibiting Plaintiff's return to work at Monarch High.

281.    Plaintiff further seeks damages, costs and reasonable attorneys' fees, and such other relief as this Court may deem just and proper.

**PRAYER FOR RELIEF**

282.    WHEREFORE, Plaintiff requests that this Court enter judgment in her favor and:

283.    Enjoin Defendant Commissioner Manny Diaz from pursuing action to sanction Plaintiff's athletic coaching certificate;

284.    In the alternative, enjoin Defendant Commissioner Manny Diaz from seeking revocation of Ms. Norton's Educator's Certificate;

285.    Enjoin Defendant Broward County School Board from prohibiting Plaintiff's return to work at Monarch High;

286.    Award Plaintiff damages for, *inter alia*, lost wages, loss of future earnings, infliction of emotional distress, punitive damages;

287.    Award Plaintiff costs and reasonable attorneys' fees; and

288.    Order such other relief as this Court may deem just and proper.

**JURY DEMAND**

Jessica Norton, by and through undersigned counsel, demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED:  January 17, 2025                    Respectfully submitted,

                                            /s/ *Jason Ross*
                                            Jason A. Ross
                                            Fla. Bar No. 59466
                                            Jason.Ross@arnoldporter.com
                                            Arnold & Porter Kaye Scholer LLP
                                            601 Massachusetts Avenue NW
                                            Washington, DC 20001
                                            Telephone: (202) 942-5000
                                            Facsimile: (202) 942-5999

Kent A. Yalowitz*
Ada Añon*
Leah Harrell*
Arnold & Porter Kaye Scholer LLP
250 W. 55th St.
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-9689
Kent.Yalowitz@arnoldporter.com
Ada.Anon@arnoldporter.com
Leah.Harrell@arnoldporter.com

Sarah Warbelow*
Jason Starr*
Cynthia Weaver*
Ami Patel*
Human Rights Campaign Foundation
1640 Rhode Island Avenue NW
Washington, D.C. 20036
Telephone: (202) 568-5762
Sarah.Warbelow@hrc.org
Jason.Starr@hrc.org
Cynthia.Weaver@hrc.org
Ami.Patel@hrc.org

*Admitted *pro hac vice*

*Counsel for Jessica Norton*