**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-cv-61874-ALTMAN**

**JESSICA NORTON**,

     *Plaintiff*,

*v.*

**BROWARD COUNTY**
**SCHOOL BOARD**, *et al.*,

     *Defendants.*

_____/

**<u>ORDER ON MOTION TO DISMISS</u>**

     Our Plaintiff, Jessica Norton, alleges that the Defendants—the Broward County School Board (the "School Board") and several individuals employed by Broward County Public Schools (the "Individual Defendants")—retaliated against her in violation of the First Amendment to the U.S. Constitution and 20 U.S.C. § 1681 ("Title IX").[1] *See* Amended Complaint [ECF No. 49] ¶¶ 247–81. In her Amended Complaint, Norton advances four claims: (1) a violation of the First Amendment by Manny Diaz, the Commissioner of the Florida Department of Education (Count I); (2) a violation of the First Amendment by the School Board (Count II); (3) a violation of the First Amendment by the Individual Defendants (Count III); and (4) a violation of Title IX by the School Board (Count IV).[2] *Ibid.* The Defendants moved to dismiss Norton's Amended Complaint on several grounds. *See generally* Motion to Dismiss ("MTD") [ECF No. 56]. After careful review, we **GRANT in part** and **DENY in part** the Defendants' MTD.

---

[1] The Individual Defendants are Howard Hepburn, David Azzarito, Craig Kowalski, Holly Tello, Thomas Honan, and Brenda Fam.

[2] Norton voluntarily dismissed Manny Diaz from this case. *See generally* Order Dismissing Manny Diaz [ECF No. 69]. Because Diaz was the only Defendant identified in Count I, we now **DISMISS** that count and **DENY as moot** the Defendants' motion to dismiss Count I.

## THE FACTS

In June 2021, Jessica Norton, a Broward County Public Schools employee, and her husband filed a federal lawsuit (the "Underlying Lawsuit") on behalf of their child, D.N., challenging the constitutionality of the Fairness in Women's Sports Act ("SB 1028")—which (Norton and her husband alleged) "violated their daughter's rights under the Constitution and Title IX." Amended Complaint ¶ 46. "Five days after Ms. Norton signaled her intention to [pursue the Underlying Lawsuit]," the Defendants, through the Broward County Public Schools Special Investigative Unit, began investigating Norton (the "SIU Investigation"). *Id.* ¶ 62.

On November 27, 2023, "Norton was called into the office of her supervisor, Amber Hendrick, the Monarch High School Office Manager." *Id.* ¶ 68. "In Ms. Hendrick's office, Ms. Norton met an armed officer: Defendant Craig Kowalski," the Chief of the Broward County Public Schools Special Investigative Unit. *Id.* ¶ 69. During this meeting, Defendant Kowalski "handed Ms. Norton a written notice and a letter of reassignment, both of which he signed, and informed her that she was under investigation for employee misconduct"—specifically, "for causing the school to not comply with SB 1028," the law Norton was challenging in federal court *Id.* ¶¶ 76, 83. "At the conclusion of this meeting, Defendant Kowalski also informed Ms. Norton, a clerical worker at Monarch High School since 2017, that she was being reassigned to Warehousing Services" pending the outcome of the SIU Investigation. *Id.* ¶ 86.

In January 2024, Defendants Honan and Tello interviewed Norton in connection with the SIU Investigation. *See id.* ¶¶ 124–37. The following month, "SIU issued a 502-page Investigative Report," detailing the findings and conclusions of the SIU Investigation. *Id.* ¶ 149. The Broward County Public Schools Professional Standards Committee subsequently recommended that Norton "receive a 10-day suspension." *Id.* ¶ 154. Defendant Azzarito declined to follow that recommendation and suggested, instead, that "the School Board terminate Ms. Norton's employment." *Id.* ¶ 156.

After several delays, on July 30, 2024, "the School Board met to consider Ms. Norton's employment." *Id.* ¶ 180. Members of the School Board discussed the discipline Norton would face because of the SIU Investigation's findings. *See id.* ¶¶ 181–204. During this meeting, Defendant Fam "questioned Ms. Norton's decision to bring the Underlying Lawsuit." *Id.* ¶¶ 203–04. At the end of the meeting, "a majority of the School Board voted to suspend Ms. Norton for 10 days without pay and prohibited her from returning to her employment as an Information Management Specialist at Monarch High." *Id.* ¶ 207. Norton was "reassigned to a clerical position in the Buildings Department"—a position that (she alleges) did not afford her the opportunity "to earn supplemental income," which she had been able to earn in her previous position. *Id.* ¶¶ 208–12.

## The Law

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

ANALYSIS

Norton asserts retaliation claims under 42 U.S.C. § 1983 against the School Board and the Individual Defendants, alleging that they "used the resources of the school district and purported to apply school policies to retaliate against Plaintiff for exercising her First Amendment right to petition." Amended Complaint ¶¶ 258, 268. Norton also asserts a retaliation claim under Title IX against the School Board, claiming that it took the kind of "materially adverse action" against her that "would have dissuaded a reasonable worker from making a charge of discrimination under Title IX." *Id.* ¶¶ 276–77.

In their Motion to Dismiss, the Defendants advance four arguments. *First*, they say that "Counts II and III should be dismissed under the *Pickering-Connick* balancing test."[3] MTD at 16. As the Defendants see it, "[t]he allegations in the Amended Complaint fail to establish any causal connection between Plaintiff's filing of the Underlying Lawsuit and any of the alleged adverse actions[.]" *Id.* at 17. In their view, "the factual allegations in the Amended Complaint establish that the School Board would have initiated its investigation and suspended Plaintiff even if the Underlying Lawsuit had not been filed." *Id.* at 19–20. *Second*, the Defendants contend that the Individual Defendants are entitled to qualified immunity. *See id.* at 21–27. *Third*, they argue that Norton's Amended Complaint "fails to allege a viable Title IX claim" *both* because "the allegations in the Amended Complaint fail to establish a causal connection between the Underlying Lawsuit and the alleged adverse actions" *and* because Norton "did not assert a sex-discrimination complaint under Title IX." *Id.* at 27–28. *Fourth*, they say that, "[i]f Count IV survives dismissal, then the Court should strike Plaintiff's claim for punitive damages[.]" *Id.* at 29. We'll address these arguments in turn.

---

[3] *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983).

I.       **The First Amendment Retaliation Claims (Counts II & III)**

The First Amendment to the U.S. Constitution "prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). While a public employee is limited in his or her "right to object to conditions placed upon the terms of employment—including those which restrict[ ] the exercise of constitutional rights"—the Supreme Court has held that "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (first citing *Connick*, 461 U.S. at 143; and then citing *Pickering*, 391 U.S. at 568). "Although the law is well-established that the state may not demote or discharge a public employee in retaliation for speech protected under the first amendment, a public employee's right to freedom of speech is not absolute." *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989) (citing *Rankin v. McPherson*, 483 U.S. 378, 383 (1987)).

Because Norton is a public employee—and since all her adverse-action allegations arise from her employment—we analyze her First Amendment retaliation claims under the test the Supreme Court articulated in *Pickering*, "the pathmarking case governing public employees' free-speech rights[.]" *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1050 (11th Cir. 2022). Here's how the Eleventh Circuit has outlined that test:

> First, the plaintiff must make a prima facie case by showing, by a preponderance of the evidence, that: (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a substantial part in the employer's decision to demote or discharge the employee. If he or she can make a prima facie showing, the burden shifts to the employer to show, by a preponderance of the evidence, that it would have reached the same decision in the absence of protected speech.

*McAlpin v. Sneads*, 61 F.4th 916, 928 (11th Cir. 2023) (quoting *Anderson v. Burke Cnty.*, 239 F.3d 1216, 1219 (11th Cir. 2001) (cleaned up)). "The first two inquiries are questions of law for the court." *Green*

*v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023) (citing *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617–18 (11th Cir. 2015)). Where the employee wasn't demoted or discharged, the third step of the prima facie inquiry centers on "whether the employee's speech played a substantial part in the 'alleged adverse employment action.'" *Lucas v. City of Delray Beach*, 692 F. Supp. 3d 1271, 1284 (S.D. Fla. 2023) (Altman, J.) (quoting *Millspaugh v. Cobb Cnty. Fire & Emergency Servs.*, 2022 WL 17101337, at *6 (11th Cir. Nov. 22, 2022)).

Norton satisfies the first two elements of the *Pickering* test. *First*, Norton's Underlying Lawsuit—challenging the constitutionality of a state statute—constitutes speech on a matter of public concern. *See Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) ("A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social, or other concern to the community." (cleaned up)); *see also Bruce v. Gregory*, 2012 WL 5907058, at *8 (M.D. Fla. Nov. 26, 2012) (Hodges, J.) ("The filing of an administrative remedy request, or the filing of a lawsuit, is protected speech under the First Amendment. Bruce has properly met his burden of establishing the first element of a retaliation claim."); *see also Rogers v. City of Coll. Park, Ga.*, 2019 WL 4168797, at *12 (N.D. Ga. Sept. 3, 2019) (Brown, J.) ("Plaintiff satisfies the first element, as both the United States and Georgia Constitutions consider the filing of a lawsuit protected free speech.").[4] *Second*, the Defendants haven't argued that they had an interest in prohibiting Norton's speech as a way of promoting the efficiency of the public services they provide. *See generally* MTD.[5]

---

[4] And Norton says as much in her complaint. *See* Amended Complaint ¶ 2 ("[Norton] filed a lawsuit on a matter that was important not just to [her] family, but to all Floridians."); *id.* ¶ 45 (alleging that Norton believed "the law would have profound and negative effects on her family, as well as other transgender children and their families throughout Florida").

[5] The Defendants say that the "Plaintiff's admitted participation in a violation of the FWSA confirms that the School Board Defendants' actions were justified by *the School Board's interest in the effective and efficient fulfillment of its responsibilities*." Reply in Support of MTD ("Reply") [ECF No. 62] at 9 (emphasis added). But this interest is asserted as part of the Defendants' argument that they had an independent

Having found that Norton has satisfied the first two elements of the *Pickering* test, we must determine whether the School Board (or any of the Individual Defendants) subjected her to an adverse employment action—and, if they did, whether Norton's speech played a substantial part in that (alleged) action.

### A.      The School Board (Count II)

#### 1.   Adverse Employment Action

Norton has properly alleged that the School Board subjected her to an adverse employment action. To determine whether a public employee has suffered an adverse employment action, we ask whether the alleged action would, "objectively, chill or deter the exercise of constitutionally protected speech." *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1379 (11th Cir. 2021) (first citing *Stavropoulos v. Firestone*, 361 F.3d 610, 619 (11th Cir. 2004); and then citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)); *see also Lucas*, 693 F. Supp 3d at 1285–86 (tracing the evolution of the Eleventh Circuit's definition of an adverse employment action). In this step of the analysis, courts in our Circuit ask whether the action altered the employee's "terms or conditions of employment or otherwise adversely affected her status as an employee." *Bowens-White v. Leon Cnty. School Bd.*, 763 F. Supp. 3d 1351, 1355 (N.D. Fla. 2025) (Walker, C.J.) (citing *Akins v. Fulton Cnty.*, 420 F.3d 1293, 1301–02 (11th Cir. 2005)).

Norton alleges that she suffered several adverse employment actions—including a ten-day suspension *without* pay and a *permanent* transfer to a position with lower earning potential. *See* Amended Complaint ¶ 207 ("On July 30, 2024, a majority of the School Board voted to suspend Ms. Norton for 10 days without pay and prohibited her from returning to her employment as an Information Management Specialist at Monarch High."); *see also id.* ¶¶ 209–12 ("Ms. Norton's reassignment to the

---

basis for disciplining Norton—not as an interest justifying a restriction on Norton's speech—so we won't consider this argument at the second step of our *Pickering* analysis.

Buildings Department was effectively a demotion and forced her to start over at a new position, leaving behind a job defined by a supportive community familiar with her capabilities for an environment where she would need to prove herself all over again and where the work was unfamiliar, as well as less personally and financially rewarding. Ms. Norton's prior position at Monarch High provided the opportunity to earn supplemental income from activities such as coordinating free and reduced meals for eligible students and acting as a student advisor. Over the last few years, Ms. Norton earned roughly an additional 36% in take-home pay through those supplemental activities.").

These are precisely the sort of employment actions that courts in our Circuit have found *would* deter a reasonable person from exercising her First Amendment rights.[6] *See, e.g.*, *Bell*, 6 F.4th at 1377; *see also Hogan v. S. Ga. Med. Ctr.*, 749 F. App'x 924, 930 (11th Cir. 2018) ("Suspension without pay is unquestionably an adverse employment action." (citing *Akins*, 420 F.3d at 1301–02 (11th Cir. 2005))); *see also Amaya v. Vilsack*, 754 F. Supp. 3d 1311, 1320 (S.D. Fla. 2024) (Altman, J.) ("Suspension without pay constitutes an adverse employment action under Title VII."); *see also Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000) ("[A] transfer to a different position can be adverse if it involves a reduction in pay, prestige or responsibility.").[7]

---

[6] The SIU Investigation itself, by contrast, is *not* an adverse employment action. *See Rademakers v. Scott*, 350 F. App'x 408, 413 (11th Cir. 2009) ("Neither the investigation itself nor the recommendation of termination were materially adverse actions[.]"); *see also Rogers v. Ga. Dept. of Corr.*, 2012 WL 5398804, at *7 (M.D. Ga. Nov. 2, 2012) (Treadwell, J.) (observing, in the Title VII context, that "the Eleventh Circuit has held that initiation of an internal investigation against an employee does not constitute an adverse employment action" (citing *Rademakers*, 350 F. App'x at 413)); *Byrd v. Gwinnett Cnty. Sch. Dist.*, 728 F. Supp. 3d 1257, 1315 n.43 (N.D. Ga. 2024) (Grimberg, J.) ("[T]he concept that the opening of an investigation into conduct is itself retaliation seems belied by the wealth of case law holding that the placement of an employee on administrative leave pending an internal investigation is not an adverse employment action, since if placing an employee on leave pending investigation is not necessarily an adverse employment action, then by extension, the simple act of investigating the employee cannot be either." (cleaned up)).

[7] The Eleventh Circuit has made clear that we *can* "apply[ ] Title VII standards of what is an adverse employment action to [a] First Amendment retaliation claim." *Stavropoulos*, 361 F.3d at 620.

### 2.   Causation: The Substantial-Part Test

Norton's Amended Complaint also includes sufficient factual allegations for us to infer that her Underlying Lawsuit "played a substantial part in the alleged adverse employment action[.]" *Lucas*, 692 F. Supp. 3d at 1284. As to this element of the *Pickering* test, courts in our Circuit weigh several factors—including "the temporal proximity of the speech to the [adverse action], whether reasons given for the [adverse action] are shown to be pretextual, comments or actions indicating that the speech and [adverse action] were connected, whether the asserted reason for [adverse action] varied, who instigated internal investigations or termination proceedings, evidence of management hostility to the type of speech in question, and other evidence of an employer's motive to retaliate." *Pattee v. Ga. Ports Auth.*, 477 F. Supp. 2d 1253, 1264 (S.D. Ga. 2006) (Edenfield, J.) (citing *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th Cir. 2000)).

As to the School Board, Norton's Amended Complaint satisfies this final hurdle. She alleges that the SIU Investigation was initiated only five days after she signaled her intention to file an amended complaint in the Underlying Lawsuit. *See* Amended Complaint ¶¶ 61–62 ("According to the subsequent Investigative Report, the SIU Investigation was initiated on November 21, 2023, when School Board member Daniel Foganholi reported an allegedly 'anonymous' tip to the Broward County Special Investigative Unit that 'a male student was playing female sports at Monarch High School.' This was just five days after Ms. Norton signaled her intention to file an Amended Complaint, by moving on November 16, 2023, for an extension of time to amend the underlying complaint, which was granted." (cleaned up)). She also says that at least one member of the School Board expressed hostility to the type of speech she was exercising. *See id.* ¶¶ 203–04 (claiming that, during the July 30, 2024, School Board meeting to consider Norton's employment, "Ms. Fam also publicly and directly questioned Ms. Norton's decision to bring the Underlying Lawsuit. Ms. Fam suggested that Ms.

Norton was being 'deceptive' in allowing her daughter to play volleyball and stated that: 'And then she turned around and filed a lawsuit to make sure that her child stayed in the female sports. Now, if she wasn't doing something she didn't think she had the legal right to do, then why file a lawsuit? Why would you do that?'"); *see also id.* ¶¶ 175–77 (detailing Defendant Fam's Facebook posts regarding the Underlying Lawsuit). Norton also claims that the justification for her suspension and reassignment may have been pretextual. *See id.* ¶ 187 ("Sarah Leonardi, the board member who seconded the motion to suspend Ms. Norton for ten days, recognized the inconsistencies in the basis for Ms. Norton's discipline, stating that she received different explanations, and had been pointed to different actions about why Ms. Norton was being disciplined." (cleaned up)). Assuming that these allegations are true—as we must at this stage of the proceedings, *see Dusek*, 832 F.3d at 1246—Norton has established a plausible causal nexus between her protected activity and the School Board's allegedly retaliatory action.

The Defendants offer two counterarguments—both unpersuasive. *First*, they claim that "the great length of time that passed after Plaintiff filed the Underlying Lawsuit is insufficient to raise the inference of a causal connection in this case." MTD at 17. According to the Defendants, because no adverse employment actions were taken against Norton for over two years after she filed her *initial* complaint in the Underlying Lawsuit, she's failed to establish a causal connection between the adverse actions and that lawsuit. For two reasons, we disagree. *One*, Norton alleges that the SIU Investigation was initiated "just five days after Ms. Norton signaled her intention to file an Amended Complaint" in the Underlying Lawsuit. Amended Complaint ¶ 62. The Defendants' insistence that we start the clock on our causation analysis from the filing of the Underlying Lawsuit ignores the reality that retaliatory action may be taken when a public employee *continues* to engage in speech the government disapproves of. *See Kuba v. Disney Fin. Servs., LLC*, 623 F. Supp. 3d 1290, 1304 (M.D. Fla. 2022) (Antoon II, J.) (finding that a reasonable jury could conclude that a plaintiff suffered retaliation almost

10

one year after the protected activity took place where subsequent activity "demonstrated a dogged commitment to the issue that [the employer] was unwilling to humor further"). *Two*, as we've discussed, temporal proximity isn't the only factor we must consider at this step of our analysis. And Norton has alleged sufficient *other* facts to raise a plausible inference that the alleged retaliatory actions were taken *because of* her protected speech.

*Second*, the Defendants argue that "[t]he factual allegations in the Amended Complaint establish that the School Board would have initiated its investigation and suspended Plaintiff even if the Underlying Lawsuit had not been filed." MTD at 19–20. But the Amended Complaint says no such thing. To the contrary, Norton has been clear that the School Board "initiated [the] investigation in response to Ms. Norton's lawsuit against the school." Amended Complaint ¶ 4. The Defendants are right that, at summary judgment, once a Plaintiff makes a prima facie showing of retaliation, "the burden shifts to the employer to show, by a preponderance of the evidence, that it would have reached the same decision in the absence of protected speech." *McAlpin*, 61 F.4th at 928. But that's not the standard that applies here—on a motion to dismiss. *See Eisenberg v. City of Miami Beach*, 1 F. Supp. 3d 1327, 1344 (S.D. Fla. 2014) (Altonaga, J.) ("This burden-shifting analysis is not appropriate at the motion to dismiss phase. A determination as to whether a defendant would have taken the same action in the absence of the protected activity is premature when the parties have not conducted discovery." (cleaned up)). The Defendants are welcome to re-raise this argument at summary judgment—after discovery has been completed.

For all these reasons, therefore, we **DENY** the Defendants' Motion to Dismiss Count II.

## B.     The Individual Defendants (Count III)

We come out the other way, however, on Norton's First Amendment claim against the Individual Defendants—mainly because she's failed to allege that *any* of the Individual Defendants subjected her to an adverse employment action.[8]

### 1.   Honan and Tello

Norton says that Honan and Tello are detectives "with the Special Investigative Unit of the Broward County Public Schools." Amended Complaint ¶¶ 18–19. She alleges that they "carr[ied] out the SIU Investigation within the scope prescribed by Defendant Kowalski," *id.* ¶ 100, and that they interviewed her (and others) as part of the SIU Investigation, *see id.* ¶¶ 125–48. Norton has failed to plausibly allege that these Defendants subjected her to an adverse employment action. Norton notably doesn't allege that Honan and Tello were responsible for her without-pay suspension or her transfer to a less-desirable position—or that they otherwise affected any condition of her employment. According to the Amended Complaint, these individuals simply conducted the SIU Investigation at the direction of their superiors—an investigation that, as we've suggested, *see supra* note 6, *doesn't* qualify as an adverse employment action, *see Rademakers*, 350 F. App'x at 413. And nothing in Norton's Amended Complaint suggests that Honan and Tello's questioning of Norton (which was limited to the interview and not otherwise alleged to be part of a longer campaign of harassment) is the sort of

---

[8] Norton urges us to "consider the Defendants' acts both individually and collectively." Response in Opposition to MTD ("Response") [ECF No. 61] at 25 (citing *Akins*, 420 F.3d at 1301). We won't be doing that. The *Akins* Court (it's true) considered several actions collectively to determine whether *the plaintiff* had suffered an adverse employment action—but it didn't suggest that the actions of one *defendant* could be imputed to other *co-defendants*. *See Akins*, 420 F.3d at 1301 ("In deciding whether employment actions are adverse, we consider the employer's acts both individually and collectively.") And the Eleventh Circuit made this point clearly in *Abella v. Simon*, 482 F. App'x 522, 523−24 (11th Cir. 2012), where it found that the district court erred "when it based its decision on the collective actions of all defendants instead of deciding whether these three officers were entitled to qualified immunity based on the allegations about each of them."

conduct that would, "objectively, chill or deter the exercise of constitutionally protected speech." *Bell*, 6 F.4th at 1379. We therefore dismiss Count III as to Honan and Tello.

### 2. Fam

Norton tells us that Fam "is a member of the Broward County School Board[.]" Amended Complaint ¶ 16. According to the Amended Complaint, Fam "emailed Florida DOE representatives Terry Stoops and Paul Burns to raise a serious concern that a transgender boy was knowingly playing volleyball on a girls' team," *id.* ¶ 110 (cleaned up), publicly commented on the Underlying Lawsuit on Facebook, *see id.* ¶¶ 168–79, and referred to Norton's actions as "criminal" at the July 30, 2024 School Board meeting, *id.* ¶ 199. None of these qualify as adverse employment actions. While Fam *is* a member of the School Board, which *did* take adverse employment action against Norton, we can't hold Fam individually responsible for the School Board's decisions because she alone was not the final decisionmaker. *See, e.g.*, *Kamensky v. Dean*, 148 F. App'x 878, 880 (11th Cir. 2005) (holding that only the final decisionmaker with "the power to terminate an employee, not merely the power to recommend termination," can be held individually liable); *Broberg v. Gerrard*, 2010 WL 2869539, at *3 (S.D. Fla. July 20, 2010) (Marra, J.) (granting motion to dismiss a complaint against an "influential" member of a multi-member municipal commission because he didn't have final decision-making authority). We therefore dismiss Count III as to Fam.

### 3. Azzarito

Norton says that Azzarito "is the Chief People Officer of Broward County Public Schools," and that his "responsibilities include supervising staff as assigned in the performance of job duties, and enforcing the negotiated contracts and overseeing the grievance, arbitration, and mediation process." Amended Complaint ¶ 15 (cleaned up). The Amended Complaint alleges that Azzarito "declined to follow the recommendation [that Norton receive a 10-day suspension] without explanation" and that he "instead recommended that the School Board terminate Ms. Norton's

employment." *Id.* ¶¶ 155–56. Azzarito also apparently failed to "clarify the nature and intent of [Norton's] purported contract renewal" with Broward County Public Schools. *Id.* ¶ 165. But merely *recommending* that an employee be terminated, without more, *isn't* an adverse employment action. *See Rademakers*, 350 F. App'x at 413 (finding that a recommendation of termination was not a "materially adverse action"). Because Norton hasn't sufficiently alleged that Azzarito subjected her to any adverse employment action, we dismiss Count III as to Azzarito.

### 4. Hepburn

Norton says that Hepburn is the "Superintendent of Schools of Broward County Public Schools," and that his responsibilities include "recommending all personnel employed by the School Board" and serving as the "Executive Officer of the School Board." Amended Complaint ¶¶ 14–15 (cleaned up). Norton alleges that Hepburn initiated the SIU Investigation, *see id.* ¶ 4, and that, through Azzarito as designee, he recommended that Norton be terminated, *see id.* ¶¶ 155–56. Again, though, that's not an adverse employment action. *See Rademakers*, 350 F. App'x at 413 ("Neither the investigation itself nor the recommendation of termination were materially adverse actions."). We therefore dismiss Count III as to Hepburn.

### 5. Kowalski

Norton says that Kowalski "was, at all relevant times, Chief of the Special Investigative Unit of the Broward County Public Schools" and was "responsible for supervising special investigations, including the investigation into Ms. Norton." Amended Complaint ¶ 17. Norton also alleges that Kowalski initiated the SIU Investigation. *See id.* ¶ 76. During the meeting at which Norton was informed of the SIU Investigation, "Defendant Kowalski handed Ms. Norton a written notice and a letter of reassignment, both of which he signed, and informed her that she was under investigation for employee misconduct"—specifically, "for causing the school to not comply with SB 1028." *Id.* ¶¶ 76, 83. "At the conclusion of this meeting, Defendant Kowalski also informed Ms. Norton, a clerical

worker at Monarch High School since 2017, that she was being reassigned to Warehousing Services" pending the outcome of the SIU Investigation. *Id.* ¶ 86. During the investigation, "Defendant Kowalski referred numerous times to the Underlying Lawsuit, indicating that the Investigation was related to the Underlying Lawsuit Ms. Norton filed on behalf of her daughter." *Id.* ¶ 85.

While Norton has sufficiently alleged that her permanent transfer to the Buildings Department qualified as an adverse employment action, we can't yet say the same about her temporary reassignment "to Warehousing Services and, later, to the custodial grounds department during the course of the investigation." *Id.* ¶ 6. Norton's Amended Complaint doesn't allege that her temporary reassignment involved "a reduction in pay, prestige or responsibility." *Hinson*, 231 F.3d at 829; *see also Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) ("[W]hen a reassignment involves no 'serious and material change in the terms, conditions, or privileges of employment,' a court should not act as a 'super-personnel department' by questioning an employer's business judgment about where it assigns employees." (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239, 1244 (11th Cir. 2001))). But even if Norton alleged that her temporary reassignment involved decreased responsibility, pay, or prestige, she would *still* need to show that these changes "were so substantial that they amounted to an adverse employment action." *Trask v. Sec'y, Dep't of Veterans Affs.*, 822 F.3d 1179, 1194 (11th Cir. 2016), *abrogated on other grounds by Babb v. Wilkie*, 589 U.S. 399, 403 (2020). She hasn't done that.

Norton doesn't describe the tasks she was asked to perform for the Warehousing-Services or Custodial-Grounds departments, nor does she explain whether those roles generated less pay, prestige, or responsibility than her previous clerical role did. We also can't tell from Norton's Amended Complaint whether Kowalski was *actually* responsible for her temporary reassignment. Norton alleges that Kowalski *informed her* of the temporary reassignment and signed the relevant paperwork—but that's all she says. *See id.* ¶¶ 76, 86. A municipal employee wouldn't be liable under the First

Amendment for performing the clerical functions of signing paperwork and telling Norton about her reassignment unless that employee had final authority to effectuate the transfer. *See Kamensky*, 148 F. App'x at 880 (holding that only the final decisionmaker with "the power to terminate an employee, not merely the power to recommend termination," can be held individually liable).

Because Norton has failed to properly allege that her temporary reassignment was an adverse employment action, we dismiss Count III as to Kowalski. Even so, we recognize that Norton *may* have a claim against Kowalski. We'll therefore allow her to amend her complaint to clarify whether her temporary reassignment might qualify as an adverse employment action—and, if it did, whether Kowalski had anything to do with it.

*** 

Norton, in short, has failed to state a prima facie claim of First Amendment retaliation against *any* of the Individual Defendants. We therefore dismiss Count III entirely. Since we've dismissed Count III, we needn't determine whether the Individual Defendants are entitled to qualified immunity.

## II.    The Title IX Retaliation Claim (Count IV)

Count IV of the Amended Complaint alleges that the School Board retaliated against Norton for bringing "a complaint against the Defendant for sex discrimination against her daughter, in violation of 20 U.S.C. § 1681." Amended Complaint ¶ 274. Norton says that, when she filed the Underlying Lawsuit, "she had a good faith and objectively reasonable basis for believing that Defendants' actions constituted violations of Title IX," and she claims that, to retaliate against her for filing that action, the Defendants took "materially adverse actions against [her] . . . includ[ing] banning [her] from the school where she worked and that her daughter attended during the course of the investigation, launching a lengthy, intrusive, harassing, and wholly disproportionate investigation into her conduct, suspending her without pay for a period of 10 days, initially reassigning her to a position

16

with no relation to her prior responsibilities, and finally reassigning her to a less desirable work location with no opportunity to earn supplemental income through her job." *Id.* ¶¶ 275–76.

To state a viable Title IX retaliation claim, a plaintiff "must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse action; and (3) that there is some causal relation between the two events." *Kocsis v. Fla. State Univ. Bd. of Trs.*, 788 F. App'x 680, 686 (11th Cir. 2019) (cleaned up). "An individual engages in protected expression when she opposes practices made unlawful by the relevant statute (the opposition clause) . . . . Opposition must be based upon a good faith belief that is objectively reasonable under existing substantive law." *Ibid.* (cleaned up). The alleged retaliatory action must be "materially adverse," such that it would have "dissuaded a reasonable individual from making or supporting a charge of discrimination." *Ibid.* "A causal link between protected expression and the materially adverse action arises where the defendant was aware of the protected expression and took materially adverse action as a result." *Ibid.*; *see also Mathews v. Clark Atl. Univ., Inc.*, 2021 WL 4896330, at *7 (N.D. Ga. Feb. 23, 2021) (Brown, J.) ("To demonstrate but-for causation at the motion to dismiss stage, a plaintiff must show (1) the decisionmakers knew of the protected conduct and (2) the protected conduct and the adverse actions were not wholly unrelated."). Assuming that Norton's allegations are true, we find that she has sufficiently stated a claim of Title IX retaliation.

### A.     Protected Expression

Norton engaged in protected expression when she filed the Underlying Lawsuit, which opposed "the legality of SB 1028 on the grounds that the law violated their daughter's rights under the Constitution and Title IX." Amended Complaint ¶ 46. Norton has alleged that her opposition to SB 1028 was predicated on her "good faith and reasonable basis to believe [that the law] constituted a Title IX violation." *Id.* ¶ 273. The Defendants argue that Norton fails to identify a protected activity because she "did not assert a sex-discrimination complaint under Title IX" in the Underlying Lawsuit.

MTD at 27. But that's just not the law—and the Defendants wisely retreat from this position in their Reply, conceding that Norton "may have asserted a Title IX claim (among others)" and arguing instead that "her belief [that SB 1028 violated Title IX] was not objectively reasonable." Reply at 14. In saying so, the Defendants point to *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022), where the Eleventh Circuit held that gender-identity discrimination does *not* constitute sex discrimination for purposes of Title IX.

But, as Norton points out in her Response, "[a]t the time Ms. Norton filed suit, the Eleventh Circuit had not yet weighed in regarding whether discrimination based on gender identity violates Title IX." Response at 18. "At that time, June 2020 precedent from the Supreme Court established that discrimination based on transgender status constituted sex discrimination for purposes of Title VII," and "[p]recedent from the Fourth Circuit suggested that discrimination on the basis of gender identity fell within the purview of Title IX." Response at 18–19 (first citing *Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020); and then citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 618–19 (4th Cir. 2020)).

Perhaps recognizing this chronology, the Defendants argue in their Reply that, since Norton's underlying *amended* complaint didn't include a Title IX claim, she hasn't properly alleged that she was retaliated against *because* she asserted a Title IX claim. *See* Reply at 14 ("In contending that she has established sufficient temporal proximity for purposes of causation, Plaintiff argues that the triggering event is not the filing of the initial lawsuit in *D.N.* but instead should be calculated from the date she signaled her intent to file an amended complaint in November 2023. This argument establishes the absence of a viable Title IX claim because the amended complaint filed in *D.N.* did not include a Title IX claim." (cleaned up)). For two reasons, we don't find this argument convincing.

*First*, Norton doesn't claim that she was retaliated against *solely* because she "moved for an extension of time to amend the underlying complaint," Amended Complaint ¶ 58, or even because she later filed the underlying amended complaint. She alleges that she was retaliated against for some

combination of (1) filing the Underlying Lawsuit, and (2) persisting with that lawsuit by pursuing an amended complaint. *See id.* ¶ 3. Norton only discusses the temporal proximity between the SIU Investigation, on the one hand, and her motion for extension of time to submit an amended complaint, on the other, as one factor (among many) that, in her view, tend to show that the Defendants subjected her to adverse employment actions *because of* her conduct in filing, and persisting with, the Underlying Lawsuit. But her argument doesn't transform her retaliation claim into one based *only* on her amended complaint (which, remember, she didn't even file until months after the SIU Investigation commenced).

*Second*, and relatedly, when the SIU investigation was initiated, Norton had only filed a motion for extension of time to amend her complaint—not the amended complaint itself. When the Defendants undertook the allegedly adverse actions, therefore, they had no way of knowing whether Norton would be advancing a Title IX claim—and no reason to believe that she wouldn't. Without that knowledge, the Defendants may well have been (as Norton alleges) motivated by a retaliatory animus towards her then-pending Title IX claim.

Norton, in short, alleges that the Defendants retaliated against her, in part, because of her Underlying Lawsuit—which, at the time of the allegedly adverse actions, *included* a Title IX claim. That's enough at this very preliminary phase of our case.

### B.   Adverse Action

As we've said, *see supra* § I.A.1., Norton has sufficiently alleged that the School Board subjected her to the sorts of adverse employment actions that could, "objectively, chill or deter the exercise of constitutionally protected speech." *Bell*, 6 F.4th at 1379. We see no reason why those same adverse actions would not have "dissuaded a reasonable individual from making or supporting a charge of discrimination." *Kocsis*, 788 F. App'x at 686. And the Defendants haven't suggested that the adverse-

employment-action analysis under Title IX differs in any material way from the analysis we've conducted under the First Amendment.

### C.     Causation

Finally, the Defendants argue that Norton failed to allege a causal connection between her protected expression and the adverse actions she allegedly suffered. *See* MTD at 27–28 ("Like her First Amendment claim, Plaintiff's Title IX retaliation claim against the School Board should be dismissed because the allegations in the Amended Complaint fail to establish a causal connection between the Underlying Lawsuit and the alleged adverse actions."). At this early stage of the case, however, Norton need only allege that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x, 906, 912 (11th Cir. 2013) (quoting *Shannon*, 292 F.3d at 716). Norton has met this low burden here.

She alleges that the School Board was aware of her Underlying Lawsuit. *See* Amended Complaint ¶ 110 ("Ms. Fam pointed to news coverage, including the articles that mentioned the Underlying Lawsuit in connection with Ms. Norton's name." (cleaned up)); *see also id.* ¶ 131 ("[The Defendants] labeled this Court's decision dismissing the Complaint in the Underlying Lawsuit as 'Documentary Evidence' and attached it as an Exhibit to the SIU's Investigative Report."); *id.* ¶ 203 ("Ms. Fam also publicly and directly questioned Ms. Norton's decision to bring the Underlying Lawsuit" at the July 30, 2024 School Board meeting.). She's also properly asserted that the Underlying Lawsuit and the alleged adverse actions were not wholly unrelated. As we've discussed, Norton plausibly claims that the School Board initiated the SIU Investigation just five days after Norton signaled her intention to file an amended complaint, *see id.* ¶¶ 61–62; that at least one member of the School Board expressed animus towards Norton's decision to file her lawsuit, *see id.* ¶¶ 175–77; and

that some of the School Board's justifications for Norton's discipline may have been pretextual, *see id.* ¶ 187.

Because Norton has properly alleged a prima facie case of Title IX retaliation, we **DENY** the Defendants' Motion to Dismiss Count IV.

### III.    Punitive Damages (Count IV)

Finally, the Defendants ask us to "strike Plaintiff's claim for punitive damages under Count IV because punitive damages are unavailable under Title IX." MTD at 30. In her Response, Norton tells us that she "does not seek punitive damages for Defendant Broward County School Board's violation of Title IX (Count IV), so this Court need not consider the availability of punitive damages under Title IX." Response at 28 n.9. Given the Plaintiff's concession, we'll **GRANT** this part of the Motion to Dismiss.

CONCLUSION

After careful review, therefore, we **ORDER** and **ADJUDGE** as follows:

1.  The Defendants' Motion to Dismiss [ECF No. 56] is **GRANTED in part** and **DENIED in part**.

2.  Count I of the Amended Complaint [ECF No. 49] is **DISMISSED** because Manny Diaz has already been dismissed from this case. *See* Order Dismissing Manny Diaz [ECF No. 69]. The Defendants' Motion to Dismiss Count I is therefore **DENIED as moot**.

3.  The Defendants' Motion to Dismiss Count II of the Amended Complaint is **DENIED**.

4.  The Defendants' Motion to Dismiss Count III of the Amended Complaint is **GRANTED**. Count III is **DISMISSED** without prejudice and with leave to amend.

Norton may, if she chooses, file a second amended complaint that corrects the deficiencies we've identified in this Order by **October 31, 2025**.

5.  The Defendants' Motion to Dismiss Count IV of the Amended Complaint is **DENIED**.

6.  The Defendants' Motion to Strike the Claim for Punitive Damages is **GRANTED**.

**DONE AND ORDERED** in the Southern District of Florida on October 17, 2025.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

22